Barbara MIGLIARO, Plaintiff,

v.

IBM LONG–TERM DISABILITY PLAN, Defendant.

No. 8:01–CV–1111–T–26TGW.

United States District Court, M.D. Florida, Tampa Division.

June 3, 2002.

Marcus A. Castillo, Haas & Castillo, P.A., Clearwater, FL, for plaintiff.

**1170**

Joel Feliciano, New York City, Jeannine Cline Jacobson, Pett, Furman & Jacobson, PL, Boca Raton, FL, for defendant.

## ORDER

LAZZARA, District Judge.

Before the Court are Defendant's Motion for Summary Judgment and supporting memorandum (Dkt.28), Plaintiff's Response to Defendant's Motion for Summary Judgment (Dkt.33), Defendant's Statement of Undisputed Facts (Dkt.29), Plaintiff's Response to Defendant's Statement of Undisputed Facts (Dkt.32), Plaintiff's Motion for Summary Judgment on Liability and supporting memorandum (Dkt.26), Plaintiff's Statement of Undisputed Material Facts (Dkt.25), Defendant's Memorandum in Opposition (Dkt.40), and various affidavits, depositions, and the administrative record. After careful consideration of the applicable law and the entire file, the Court concludes that Defendant's Motion for Summary Judgment (Dkt.28) should be denied and Plaintiff's Motion for Summary Judgment on Liability (Dkt.26) should be granted.

## BACKGROUND

This is an action brought by an employee pursuant to the Employee Retirement Income Security Act of 1974 (ERISA) based on a denial of her long-term disability benefits. It is undisputed by the parties that she was an eligible participant in the IBM Long–Term Disability Plan (the Plan). Metropolitan Life Insurance Company (MetLife) insured long-term disability coverage under the Plan through a group insurance policy issued by MetLife to IBM Corporation (IBM), Plaintiff's employer.

*Medical and Work History*

Plaintiff Barbara Migliaro worked for IBM as an "Entry Marketing Support Professional." She sustained severe injuries to her back in an automobile accident on December 2, 1995. In addition to her general practitioner, Plaintiff saw several other physicians. She first saw her neurologist, Dr. Robert Martinez, five days after the accident in December 1995. In mid-January 1996, Dr. Martinez noted that Plaintiff continued to suffer from headaches, neck pain, back pain, numbness in her left arm and thigh, among other symptoms. (Dkt. 30 at Exh. 2, CL–0618). Later in January 1996, Plaintiff underwent an MRI of the cervical spine which showed a "minimal bulge at C7–T1." (Dkt. 30 at Exh. 2, CL–0467). In February 1996, Dr. Martinez noted that her pain level continued at a level as high as 7 on a scale of 0 to 10. (Dkt. 30 at Exh. 2, CL–0621). At her monthly appointment in March 1996, Dr. Martinez's neurological impressions remained the same: chronic severe cervical, thoracic and lumbosacral strain; cephalgia secondary to cervical strain; and bulging cervical disc at C7–T1. (Dkt. 30 at Exh. 2, CL–0624). Although the diagnosis remained the same, Dr. Martinez permitted her to work only in the mornings at that time. (Dkt. 30 at Exh. 2, CL–0631).

Plaintiff first saw Dr. Ronald Latronica, a chiropractor, in September 1997. (Dkt. 30 at Exh. 2, CL–0580). Dr. Latronica diagnosed Plaintiff with all of the same conditions as did Dr. Martinez. (Dkt. 30 at Exh. 2, CL–0580–0582). Plaintiff eventually underwent a series of nerve blocks from physicians at a pain management center. (Dkt. 30 at Exh. 2, CL–0594).

In December 1997, Dr. Martinez wrote that Plaintiff "is not able to go to work at her regular job because of the chronic pain she is experiencing.... [and] has a limited ability to walk due to a pelvic tilt and dysfunctional sacroiliac (of her body), which cause chronic pain and resultant stress." (Dkt. 30 at Exh. 2, CL–0639). Dr. Martinez opined that as of December

1997, Plaintiff had reached maximum medical improvement and had suffered a permanent injury with a 21% permanent partial impairment rating to the body as a whole as a result of the accident. (Dkt. 30 at Exh. 2, CL–0638 and 0641).

After the accident in 1995, the claims diary notes reflect that Plaintiff "WAS OUT OF WORK BUT RETURNED TO WORKING 4HRS IN THE MORNINGS AS OF 6–12–96." (Dkt. 30 at Exh. 2, CL–0004). According to the case manager's notes, Plaintiff continued to work as much as she could from 1996 until May 21, 1998, her last day of work. In late March 1998, her attending physicians had recommended that she work from home. (Dkt. 30 at Exh. 2, CL–0004). IBM denied her request to work either an 8–hour day from home or a split day of 4 hours at home and 4 hours on site. (Dkt. 30 at Exh. 2, CL–0006). Her sickness and accident salary was scheduled to expire in September 1998. (Dkt. 30 at Exh. 2, CL–0004).

*Initial Application for Disability*

As early as January 28, 1998, IBM opened a disability file on Plaintiff. Plaintiff submitted reports from three treating physicians: Dr. Deborah Shultz, a general practitioner; Dr. Robert Martinez, a neurologist; and Dr. Ronald Latronica, a chiropractor. (Dkt. 30 at Exh. 2, CL–0004). All three doctors rated Plaintiff as a class 5 for physical impairment, the highest class, which means Plaintiff has severe limitation of functional capacity and is incapable of minimum (sedentary) activity. (Dkt. 30 at Exh. 2, CL–0581, 0610, and 0647). Dr. Martinez diagnosed Plaintiff with "cervical and lumbar disk disease, dysfunctional sacroiliac joint, [and] posteriorly forward pelvic tilt." (Dkt. 30 at Exh. 2, CL–0608). Both Drs. Martinez and Latronica diagnosed Plaintiff with sciatica and chronic back pain. (Dkt. 30 at Exh. 2, CL–0580 and 0608). Dr. Martinez listed Plaintiff's symptoms as pain and swelling in the cervical and lumbar area, fatigue, and pain with gait. (Dkt. 30 at Exh. 2, CL–0608). Dr. Latronica wrote Plaintiff's symptoms as lower back pain, sciatica, headaches, bilateral leg pain, chronic fatigue, numbness in one of her legs and pain with gait. (Dkt. 30 at Exh. 2, CL–0580).

The disability file shows that as of July 1, 1998, in the case manager's opinion, Plaintiff should be approved for the "own occupation" definition.[1] The case manager's notes document that all three of Plaintiff's treating physicians opined that "SHE IS TD OWN AND ANY/ALL OCC." (Dkt. 30 at Exh. 2, CL–0004). On August 10, 1998, Plaintiff was officially approved under the "own occupation" definition. (Dkt. 30 at Exh. 2, CL–0007). The claims dairy reflects that on that day Plaintiff was unable to perform the functions of her position which required her to be on site and required walking. (Dkt. 30 at Exh. 2, CL–0007–0008). The initial case manager worked on Plaintiff's file from January 1998 through August 12, 1998. (Dkt. 30 at Exh. 2, CL–0009). After that date, case manager Joanne Martin worked on Plaintiff's file.

*Transition from "Own" to "Any" Occupation*

In September 1999, Plaintiff's status would transition from the "own occupation" definition to the "any occupation" definition of total disability. The revised SPD defines "totally disabled" in pertinent part as follows:

> [D]uring the first 12 months after you complete the waiting period, you cannot perform the important duties of your

---

1. According to the parties, the Plan in 1998 defined "total disability" as "during the first 12 months after you complete the waiting period, you cannot perform the important duties of your regular occupation with IBM because of a sickness or injury."

regular occupation with IBM because of a sickness or injury. After expiration of that 12 month period, totally disabled means that, because of a sickness or injury, you cannot perform the important duties of your occupation or of any other gainful occupation for which you are reasonably fit by your education, training or experience.... Your regular occupation with IBM means the regular occupation you had with IBM as of your last day of active status.

See SPD at para. 3.4.1. At this time, Ms. Martin's notes reflect that she suggested an IME for Plaintiff. (Dkt. 30 at Exh. 2, CL–0015).

Dr. Joseph Sena conducted an IME on September 9, 1999. (Dkt. 30 at Exh. 2, CL–0204–0207; 0247–0250). Dr. Sena conducted a physical examination of Plaintiff and recommended that she "should avoid very repetitive bending in the low back and avoid heavy lifting." His report noted that she had reached maximum medical improvement and had "sustained a permanent partial impairment secondary to the motor vehicle related injuries, which occurred on 12/2/95, resulting in an unresolved sacroiliac sprain/strain." She had x-rays taken at Dr. Sena's office and Dr. Sena concluded that there were "some degenerative changes of the cervical spine, in particular at the C6–C7 level with osteophyte formation." The views of the sacroiliac joints revealed "mild degenerative changes of the sacroiliac joints" which were not advanced from the earlier films taken in 1997. Dr. Sena commented in his report that "the patient's verbal complaints or the patient's own narrative describe greater complaints than that documented clinically." (Dkt. 30 at Exh. 2, CL–0250).[2]

Thereafter, MetLife sent a copy of Dr. Sena's evaluation to Plaintiff's treating physicians: Dr. Robert Martinez and Dr. Deborah Shultz. (Dkt. 30 at Exh. 2, CL–0251–0252; 0202–0203). MetLife's letter to Dr. Martinez acknowledged his report of March 23, 1999, in which he found "chronic cervical, thoracic and lumbosacral strain with cephalalgia, insomnia secondary to pain and a bulging disc at C7–T1" and "100% permanently, totally disabled, unable to work, function or compete in a competitive job environment of any kind of the rest of her life." (Dkt. 30 at Exh. 2, CL–0292–0294). MetLife sought comments from Dr. Martinez regarding Dr. Sena's opinion. Dr. Martinez responded that he strongly disagreed with Dr. Sena's opinion and offered to reevaluate Plaintiff. (Dkt. 30 at Exh. 2, CL–0218).

MetLife's letter to Dr. Shultz notes that MetLife reviewed her physical capacity evaluation of Plaintiff dated May 22, 1999. Dr. Shultz had concluded that Plaintiff could not push, pull, bend, squat, crawl, climb, sit longer than 20 minutes, walk longer than 5–10 minutes, or stand or carry something up to ten pounds for any period of time. Dr. Shultz responded that she was in total disagreement with Dr. Sena. (Dkt. 30 at Exh. 2, CL–0174).

In late 1999, Ms. Martin ordered a Functional Capacity Evaluation (FCE). The FCE, which was conducted on January 11 and 12, 2000, reported that her current diagnosis "[is] lumbar disc lesion and disc disease, dysfunctional sacroiliac joint, cervical and lumbar disc disease, and bulging disc at C7–T1." (Dkt. 30 at Exh. 2, CL–0209). The summary of results recites in part the following observations:

Deficits found in the musculoskeletal evaluation include: gait, posture, AROM

2. In her deposition, Ms. Martin acknowledged her disappointment with Dr. Sena in that he lost his office notes regarding Plaintiff's visit. (Dkt.27). Ms. Martin attempted to have Dr. Sena removed from the referral list of IME's. (Dkt.27, Exh. 14).

[range of motion], flexibility, and pelvic alignment and strength.... Functional lifting revealed that she is presently lifting in the sedentary category of work.

Also in the summary portion of the FCE, the tested noted "self limiting behaviors and inconsistencies" as follows:

Distracted straight leg raise. Cogwheeling noted on day 1 and 2 with all lower extremity strength testing. While testing bilateral plantar fexion left foot dropped with resistance applied to only the right foot. Patient was unable to demonstrate push greater than 10 feet with 8# of force secondary to reports of increased low back pain, but was able to demonstrate an average of 33# of force with isometric push force and was able to push open facility and restroom doors requiring 8# of force .... AROM measurements were not consistent with observed movements for lumbar side bending and rotation throughout testing. *Client was self limited by increased pain* throughout testing with no significant change in heart rate noted.

(Dkt. 30 at Exh. 2, CL–0209) (emphasis added). Despite the tester's subjective interpretation of Plaintiff's behavior as self limiting, the FCE concluded that Plaintiff's abilities "are not consistent with the ability to work an eight hour day." (Dkt. 30 at Exh. 2, CL–0209). Nevertheless, the FCE concluded that Plaintiff "is currently functioning at a Sedentary level." (Dkt. 30 at Exh. 2, CL–0209).

Under the "physical demands" portion of the FCE, the tester made the following comments, admitting that she cried and her blood pressure remained elevated after exertion:

Client was self-limited by complaints of increased low back pain with all lifts. Client was unable to demonstrate a floor to knuckle lift with a 2# crate secondary to reports of increased pain but was able to squat/kneel fluidly. No significant

change in heart rate was noted. Patient had to lie on the floor during lift testing, stating she needed to fix herself. Patient states she is able to correct pelvic assymetry by lying on the floor and "popping" it back in. *Client began to cry post lift testing secondary to increased pain. Blood pressure remained elevated after 30 minutes of sitting.* Material handling was performed on the second day.

(Dkt. 30 at Exh. 2, CL–0214) (emphasis added). The tester made the following comments under the "positional tolerance" section, acknowledging her increased pain:

Client was self limited by complaints of increased pain. No significant change in heart rate was noted. Client declined attempting push/pull greater than 10 feet stating, "It will hurt me." Client utilizes assistance to get up off the floor. *Stooping was performed only down to knees secondary to reports of increase low back pain.*

(Dkt. 30 at Exh. 2, CL–0214) (emphasis added). The FCE, in another section, stated that Plaintiff's blood pressure increased after the testing on the first day. (Dkt. 30 at Exh. 2, CL–0212).

Dr. Shultz had the opportunity to review the FCE. In her opinion, she agreed with their recommendation that Plaintiff could not function in an eight hour work day. She opined on May 1, 2000, that Plaintiff "has continued limited range of motion and pain of the cervical and lumbar spine, severe pain and spasms of the right sacroiliac joint, decreased grip strength bilaterally more so in the left hand, and intermittent neuropathy to both legs." She reiterated her position as being aligned with that of Dr. Martinez——Plaintiff was totally disabled, being unable to "physically or psychologically function in any work environment."

In March 2000, Ms. Martin ordered a surveillance of Plaintiff. On the Special Investigation Request, Ms. Martin wrote as part of her reason for referral that "[a surveillance] would make a stronger case to find claimant active without severe limitations." (Dkt. 30 at Exh. 2, CL–0241). An employee of MetLife scheduled a surveillance of Plaintiff for April 4 and 5, 2000. (Dkt. 30 at Exh. 2, CL–0192–0196; Exh. 3). The surveillance report concluded that Plaintiff, over a two-day span, engaged "in physical activities including walking, standing, bending at the waist, sitting, turning her neck and head, and driving." (Dkt. 30 at Exh. 2, CL–0192). The report and videotape revealed that Plaintiff used a cane the two times she left her apartment to check her mailbox, which is relatively close to Plaintiff's apartment. On the first day, Plaintiff did not leave the apartment until 1:03 p.m. For the following one and a half hours Plaintiff sat on her patio, intermittently going back inside her apartment. While she did not use a cane on the rather small patio, none of the physicians maintained that she had to use a cane when she was moving about in the confines of her patio where ample furniture offered support.

*Termination of Benefits*

MetLife terminated Plaintiff's long term benefits effective June 1, 2000. (Dkt. 30 at Exh. 2, CL–0176, 0180–0181). The letter provides in pertinent part:

> Your past job experience consisted of three years at IBM in Customer Assistance–Passwords and as an Entry Marketing Support Professional. These jobs are considered sedentary in nature. You are required to sit, use fine visual auditory attention and precise verbal/written communication 61%–100% of the day, reaching and fine had dexterity 20%–60 & of the day, and standing, walking, pushing, pulling, twisting, grasping, handling, bending, stooping, squatting, carrying and or lifting from 1 pound to 15 pounds 1% to 19% of the day. From December 1997 through August 1997 you were a Registered Representative and from March 1991 through May 1998 you worked in Marketing, Business Support. These jobs are also considered sedentary. You have a High School diploma, some college and have taken courses at New York Institute of Finance.
>
> We have reviewed information submitted by Robert Martinez, M.D., covering treatment dates from December 7, 1995 through January 13, 2000. Dr. Martinez stated you are permanently and totally disabled for the rest of your life. However, the information submitted did not provide definitive information or any test results supporting these functional limitations.
>
> We have reviewed information submitted by Deborah Shultz, M.D., covering treatment dates from December 8, 1995 through May 22, 1999. It was reported that you are able to sit for 20 minutes but you must readjust and you are able to walk or stand 5 to 10 minutes before resting. Objective information in your file does not support this statement.
>
> To obtain a clearer picture of your current condition, we had you evaluated by an Independent Medical Examiner, Joseph Sena, M.D., a Board Certified Orthopedic Surgeon on September 9, 1999. Dr. Sena did report that you should avoid repetitive bending in the low back area and avoid heavy lifting as well. He also indicated that you were at maximum medical improvement. However, you have no significant evidence of permanent injury to the neck. You do have some degenerative changes in the sacroiliac joints but this is not advanced. The report also indicated that the muscle testing performed on the upper and lower extremities are within normal limits

and you are without atrophy. Dr. Sena also commented that your complaints are greater than what is documented clinically.

Additionally, to obtain a clearer picture of your physical capacities status, we referred you to independent evaluators for a Functional Capacity Evaluation (FCE) which was done on January 11, 2000 and January 12, 2000. The results of the FCE indicated your capability to perform job duties in occupations include sitting, standing, walking, climbing, occasional bending, reaching overhead, crawling, squatting, kneeling, stooping, crouching, trunk twist, reaching forward. This test was unable to determine your level of endurance, as your ability to ambulate did not reach the minimal testing speed of 2mph. Isometric strength testing controls showed inconsistent effort with means that submaximal effort was given. The ability to perform in a sedentary occupation is supported despite your lack of effort. A review of the Activities of Daily Living form that you completed, you indicated that your sciatic nerve often causes severe pain down one or both legs and you experience excessive pulling and straining. Your pain will then rise to a 8–9 level with absolute minimum ability to walk, pain travels to the top of your foot/ankle area. Pelvic tilt on right side is forward and out to right, diagnosed from several neuromuscular professionals. Stiffness and pain causes your posture to fall forward and you lack balance. You also added in parenthesis that you are cane enabled for insufficient balance, pain and weakness in legs.

We observed your activities on April 4, 2000. We observed you engaging in physical activities including walking, standing, bending at the waist, sitting,

turning your neck and head as well as driving.[3] You were also observed not utilizing the support of your cane at various times. It appears that your activities are inconsistent with your restrictions and limitations.

(Dkt. 30 at Exh. 2, CL–0176, 0180–0181). After Plaintiff appealed the denial of benefits, the appeals unit of MetLife upheld the termination decision on June 28, 2000. (Dkt. 30 at Exh. 2, CL–0162). The written denial provided in pertinent part:

> As explained in our May 2, 2000 correspondence [Plaintiff] attended an independent medical examination with Dr. Sena on September 9, 1999. It was Dr. Sena's opinion that [Plaintiff] should avoid repetitive bending of the lower back and avoid heavy lifting. He felt she had reached maximum medical improvement and her pain complaints were greater than what was documented clinically.
>
> [Plaintiff] attended a functional capacity evaluation (FCE) on January 11 & 12, 2000. The results of the FCE indicated [Plaintiff] provided sub-maximal effort, however even with the effort provided it was reported [Plaintiff] would be capable of sedentary work level activities.
>
> We also observed [Plaintiff's] daily activities on April 4, 2000. She engaged in physical activities including driving, walking, standing, sitting and bending at the waist. She also only utilized a cane at certain times.
>
> Her attending physician Dr. Robert Martinez supports disability according to his letter dated January 13, 2000. He stated, "Barbara has been unable to work, unable to function, unable to do anything uninterruptedly because of her pain." His impression was chronic cervical, thoracic and lumbosacral strain

**3.** This Court notes that the videotape does not show Plaintiff driving on April 4, 2000.

with cephalalgia, insomnia secondary to pain and degenerative disk at C7–T1. Recommendations for treatment included medications, Williams' exercises, walking and aqua therapy, TENS unit, follow-up with Dr. Richard Silver and Dr. Mike Wasylik and chronic pain management with Dr. Barsa. In reviewing [Plaintiff's] claim it noted Dr. Martinez recommended the same treatment in March 1999 and December 1997. However, based on his statements [Plaintiff] has not improved and is still in constant pain. He stated she has severe head, neck, mid and low back pain. Our records indicated that [Plaintiff] does not wear a TENS unit and was last seen by Dr. Barsa on September 2, 1997. We have no information from Dr. Wasylik or Dr. Silver. It does not appear [Plaintiff] was in treatment with either of these physicians.

Her attending physician Dr. Deborah Shultz indicated in her latest letter dated May 1, 2000 that [Plaintiff] is not capable physically or psychologically to function in any work environment. She stated [Plaintiff] has continued limited range of motion, severe pain and spasms of the right sacroiliac joint, decreased grip strength bilaterally and intermittent neuropathy to both legs. Dr. Shultz agreed with Dr. Martinez's opinion that [Plaintiff] remains totally disabled.

Based on our review, [Plaintiff's] physicians are supporting her continued disability based on her subjective pain complaints. There is no objective medical information in our file to support such severe subjective complaints. A MRI of the cervical spine performed January 23, 1996 revealed normal cervical, spine

with no evidence of focal disc herniation or spinal stenosis. There was a minimal bulge at disc C7–T1 however this would not be the cause of [Plaintiff's] severe pain complaints and would not preclude sedentary work. A MRI of the lumbar spine dated January 23, 1996 and a MRI of the brain dated November 20, 1997 were noted to be normal. X-ray's of the cervical and lumbar spine are also noted to be normal. No current testing has been submitted for our review.

(Dkt. 30 at Exh. 2, CL–0162–0163). The decision was signed by Kim Maneen, Senior Case Management Specialist Appeal Unit.[4]

*The Summary Plan Description*

The Summary Plan Description (SPD) defines the fiduciaries as the Named Fiduciary, MetLife, and the Plan Administrator, which is listed as the Human Resources Center of IBM. *See* SPD at paras. 3.5 and 3.5.2. MetLife as a fiduciary possesses the responsibility of "provision of full and fair review of claim denials pursuant to Section 503 of ERISA." *See* SPD at para. 3.5.2. The Plan Administrator controls and manages the Plan in "all other areas" other than MetLife's and the Named Fiduciary's. *See* SPD at para. 3.5.2. The SPD gives discretionary authority to the Plan Administrator and other Plan Fiduciaries "to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits." *See* SPD at para. 3.5.3.[5] The Plan also provides that eligibility for Social Security disability income benefits does not guarantee benefits under the IBM Long–Term Disability Plan. *See* SPD at para. 3.4.5.

---

4. MetLife received the Notice of Social Security Benefits on July 6, 2000, after the June 28, 2000, appeal review had been completed. (Dkt. 30 at Exh. 2, CL–0024).

5. *See also* SPD at Notices ("Plan Administrator retains exclusive authority and discretion to interpret the terms of the benefits plans").

## STANDARD OF REVIEW

■ When the plan documents explicitly grant the claims administrator the discretion to determine eligibility or construe the terms of the plan, the arbitrary and capricious standard is applied. *See HCA Health Serv. of Georgia, Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 992 (11th Cir.2001) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). The Eleventh Circuit has modified this arbitrary and capricious standard in cases in which the claims administrator was acting under a conflict of interest. *See HCA Health Serv.*, 240 F.3d at 993 (citing *Florence Nightingale Nursing Serv. Inc. v. Blue Cross/Blue Shield*, 41 F.3d 1476, 1481 (11th Cir.1995)). The modified standard is called the "heightened" arbitrary and capricious standard. *See Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1325–26 (11th Cir.2001); *Brown. v. Blue Cross & Blue Shield of Ala., Inc.*, 898 F.2d 1556, 1563–64 (11th Cir.1990) (noting that heightened standard "must be contextually tailored" to case).

■ Once the court determines whether the plan documents grant discretion to the claims administrator to interpret the terms, then the court must apply at the very least the arbitrary and capricious standard and possibly the heightened arbitrary and capricious review. *See HCA Health Serv.*, 240 F.3d at 993. "Regardless of whether arbitrary and capricious or heightened arbitrary and capricious review applies, the court evaluates the claims administrator's interpretation of the plan to determine whether it is 'wrong'." *See id.* An administrator's decision is deemed "wrong" when the court disagrees with the claims administrator's plan interpretation after a de novo review of the plan documents and disputed terms. *See id.* at n. 23. If the court disagrees with the decision and thus finds it "wrong," then the court next decides whether "the claimant has proposed a 'reasonable' interpretation of the plan." *See id.* at 994, quoting *Lee v. Blue Cross/Blue Shield*, 10 F.3d 1547, 1550 (11th Cir.1994).

■ Even if the claimant's proposed interpretation is reasonable, the court must still determine whether the claims administrator's "wrong" interpretation is reasonable. At this point, the court must gauge the self interest of the claims administrator. *See HCA Health Serv.*, 240 F.3d at 994. If there is no conflict of interest, then the inquiry stops, and review is arbitrary and capricious. *See id.* If a conflict does exist, then the heightened arbitrary and capricious review must be invoked. *See id.*

■ Under the heightened standard of review, "the burden shifts to the claims administrator to prove that its interpretation of the plan is not tainted by self-interest." *HCA Health Serv.*, 240 F.3d at 994. The claims administrator satisfies this burden by showing that its "wrong but reasonable" plan benefits the class of participants and beneficiaries. *See id.* at 995. Even if the claims administrator accomplishes this task, "the claimant may still be successful if he can show by other measures that the administrator's decision was arbitrary and capricious." *See id.* If it cannot be shown that the participants and beneficiaries of the plan are benefitted, then the claims administrator's plan interpretation is not entitled to deference.

## DISCUSSION

■ In this case, the plan grants discretion to the claims administrator to interpret the terms of the plan. Thus, this court must conduct a de novo review of whether the interpretation was "wrong" as that term is defined by case law in this circuit. If this court determines that the interpretation was "wrong," and thereafter

not reasonable, next the court looks at whether a conflict of interest exists. When the plan fiduciary making the benefit decision is also the insurance company responsible for paying claims, as is MetLife in this case, the heightened arbitrary and capricious standard is applicable. *See Brown*, 898 F.2d at 1564.

## I. MetLife's Interpretation as Wrong

Based on a de novo review of the information before MetLife, this court disagrees with the plan fiduciary's decision to deny long-term benefits to Plaintiff. It is undisputed that MetLife relied on the surveillance report and videotape, the IME of Dr. Sena, and the FCE to deny benefits. These three bases will be addressed separately.

*The Surveillance Report and Videotape*

 The surveillance report is, at a minimum, misleading. The bold, unexplained statements that Plaintiff walked, stood, bended, sat, and turned her neck and head, fail to overcome the stark reality shown by the videotape. Plaintiff left her apartment a total of two times on April 4. On each occasion, she walked to her apartment's mailbox with the use of a cane. The fact that she walked a couple of steps to her small patio, sat in a chair, and looked in different directions on occasion, does not constitute a failure to follow her physicians' advice or an ability to maintain a sedentary job. It merely shows that she is able to move through a doorway to her attached patio for a relatively short period during the day without the absolute necessity of a cane.

With respect to driving her car, which is parked very close to her apartment in a handicap place, the videotape discloses that she did not drive at all on April 4. To the extent the report indicates that she drove somewhere on April 5,[6] her physicians never told her she could not drive. Her doctors simply recommended that she not drive for long distances or long periods of time. (Dkt. 30 at Exh. 2, CL–0582, 0609). Assuming Plaintiff drove somewhere on April 5, this activity does not justify a determination that she could withstand even a sedentary job. The videotaped surveillance does not illustrate that Plaintiff can function at a sedentary job away from home. Moreover, there is nothing contradictory about the movements made by Plaintiff on the tape and the medical information before MetLife. Information gathered from the surveillance only confirms that Plaintiff uses a cane whenever she leaves her apartment and that she needs to return inside her apartment after sitting a short period on her patio.

*The IME*

 Dr. Sena is an orthopedic surgeon. Dr. Sena's report indicates that the x-ray's taken in 1999 were not much different than 1997. Dr. Sena did not opine as to the exact percentage of permanent partial impairment, as did Dr. Martinez (21% permanent partial impairment to body as a whole and 100% permanently totally disabled).[7] Dr. Sena did not render an opinion as to what class (1 through 5) Plaintiff ranked for physical impairment, whereas all three attending physicians rated Plaintiff as severely limited of functional capacity and incapable of minimum (sedentary) activity. Dr. Sena ended his report with the conclusory, subjective comment that Plaintiff's

---

**6.** This Court could not find a portion of the videotape showing the surveillance of April 5, and MetLife's denial of the appeal mentions only the April 4 date.

**7.** Dr. Shultz opined that Plaintiff was incapable physically or psychologically to function in any work environment.

complaints were greater "than that documented clinically."

MetLife essentially took its chosen, paid physician's opinion that Plaintiff was exaggerating her claims of pain. He did not indicate what objective measures, if any, he used to support his opinion. This case is not one in which a treating physician testified that he or she found the physical examinations of the claimant negative but "determined [the patient's] functional capacity by simply putting down what [the patient] told [the doctor] [the patient] could do." *See Schindler v. Metropolitan Life Ins. Co.,* 141 F.Supp.2d 1073, 1081 (M.D.Fla.2001). There is no testimony or indication from Plaintiff's physicians that they ever diagnosed her exclusively by her complaints of pain. Their notes and reports reflect findings, on physical examination, of evidence to support Plaintiff's pain—a bulging cervical disc, a chronic cervical, thoracic and lumbosacral strain with swelling in the cervical and lumbar area, a pelvic tilt and a dysfunctional sacroiliac with x-rays showing degenerative changes of the sacroiliac joints.

### The FCE

 Healthsouth Rehabilitation Center of Clearwater conducted the FCE. While the FCE recommended that Plaintiff is functioning at a sedentary level, it simultaneously found that Plaintiff could not work an eight-hour day.[8] The FCE noted that Plaintiff's blood pressure remained elevated after 30 minutes of sitting upon completion of the physical demands portion of the test. The FCE documented Plaintiff's crying after attempting a lifting test due to increased pain. Plaintiff stopped performing some of the tests when she told the testers that she was experiencing increased pain. Plaintiff showed reticence in trying some of the testing because her

physicians had told her not to squat, lift, push, pull or bend.

Like the IME, the FCE noted that Plaintiff's complaints of pain prevented her from demonstrating her full potential. The FCE provides no objective basis for this conclusion. MetLife's attorneys draw to the Court's attention the observation in the FCE that Plaintiff opened facility and restroom doors, which required the same exertion of strength as some of the tests that she did not pass. The file, however, is replete with medical notations that Plaintiff endures times of more severe pain than others. That Plaintiff could open some doors on occasion does not negate the outcome of the standardized tests she was given. Obviously, Plaintiff did not perform up to the tester's expectations. Those expectations, however, do not appear to have been based on objective information before the testers.

### Other Observations

MetLife appears to have engaged in a selective review of medical evidence to deny benefits. Plaintiff's treating physicians have all continued to treat her since the accident in late 1995. Nonetheless, MetLife concluded, without record support, that the bulge at disc C7–T1 could not be the cause of complaints of severe pain and therefore Plaintiff could perform sedentary work. MetLife goes so far as to state that "no objective medical information" exists in the file to support such "severe subjective complaints."

It is difficult to know exactly what MetLife would consider to be "objective medical information" supporting the degree of pain a particular individual suffers. That Plaintiff no longer undergoes nerve blocks does not constitute "objective medical information" that she no longer suffers pain.

8. Dr. Shultz agreed with the FCE that Plaintiff could not work an 8–hour day.

As noted in the file, the nerve blocks did not always provide Plaintiff with sustained relief from pain. In any event, this Court finds that the surveillance report and videotape is immaterial.[9] Furthermore, the IME and FCE do not present any "objective medical information," as that phrase has been employed by MetLife, to support the denial of benefits. They merely show that Dr. Sena and the testers did not subjectively believe the severity of her pain.

## II MetLife's interpretation as unreasonable

 Even though this Court has found that the decision was "wrong," it must now address whether there was a reasonable basis for the decision based upon the facts known to the administrator at the time of the decision. *See Jett v. Blue Cross & Blue Shield of Ala., Inc.,* 890 F.2d 1137, 1140 (11th Cir.1989); *Millman v. Kemper Nat'l Serv. Plantation, Fla.,* 147 F.Supp.2d 1329, 1334 (S.D.Fla.2001). Unlike other situations, there is no basis to construe the IME and FCE as conflicting with the attending physicians' opinions.[10] To the extent the IME and FCE concluded that the degree of Plaintiff's pain was exaggerated with respect to her physical ailments, the IME and FCE do not provide any objective medical test showing that her physical injuries and medical diagnosis were anything other than what she had always presented. Therefore, the Court finds that the "wrong" decision was also not reasonable on the part of MetLife.

9. It actually supports her claim.

10. There is no history in this case, as in others, that Plaintiff was ever discharged from her treating physicians' care or that her doctors ever determined that she was anything but totally disabled.

11. Even if the interpretation benefits the plan, Plaintiff may show other "other measures"

## III Conflict of Interest

 Having reached the point of inquiry regarding a conflict of interest, this Court must decide whether MetLife's interpretation of the Plan benefits the beneficiaries. MetLife carries the burden of establishing that its interpretation does benefit the beneficiaries or participants of the Plan.[11] MetLife has not met its burden of showing that it does not have more of a financial interest in denying claims than it does in granting benefits. The participants of the Plan are not benefitted if anyone of them, such as Plaintiff, becomes totally disabled and is unable to receive long-term disability benefits. *Cf. Vickers v. Guardian Life Ins. Co.,* 2002 WL 993585, at *5–6 (M.D.Fla. Apr.25, 2002) (holding that mutual company which lacked traditional profit motives "still has a financial interest in denying claims in order to remain economically viable as well as competitive within the insurance industry").[12] Accordingly, the Court finds that under the heightened arbitrary and capricious standard, MetLife should have deemed Plaintiff eligible to receive long-term disability benefits.

It is therefore **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion for Summary Judgment (Dkt.28) is **DENIED**.

2. Plaintiff's Motion for Summary Judgment on Liability (Dkt.26) is **GRANTED**, thereby entitling Plaintiff to the long-term disability benefits under the Plan less any adjustments after

warranting a finding that the decision was arbitrary and capricious.

12. To the extent that notations in the file suggest that Ms. Martin was determined to build a case for denial of benefits from the moment she took over the file, this behavior, as suggested by Plaintiff, does not lend itself to making untainted decisions.

the recovery of any Social Security Disability Benefits.

3. This case shall proceed to trial on damages, including attorneys' fees and costs.